In re DUGGAN.

(District Court, S. D. Georgia, W. D. June 24, 1910. On Reargument, July 5, 1910.)

1. FRAUDULENT CONVEYANCES (§ 1*)—"FRAUD"—DEFINITION.

The term "fraud," as used in the law of fraudulent conveyances, means facts tending to throw suspicion on a transaction calling for an explanation, an act made to hinder and defraud creditors.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 3, pp. 2943–2954; vol. 8, p. 7666.]

2. BANKRUPTCY (§ 189*)—MORTGAGES—RECORD—OMISSION—EFFECT.

· Where by a secret agreement between a bankrupt and one of his creditors, who had a chattel mortgage on the bankrupt's stock, the mortgage was withheld from record that the bankrupt might obtain credit to which she was not entitled, the mortgage was fraudulent and void, not only as to subsequent creditors, but as to all those interested in the bankrupt's estate.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 189.*]

---

In the matter of bankruptcy proceedings of Mrs. S. L. Duggan. On petition by the trustee to review a referee's order sustaining the validity of an unfiled chattel mortgage. Reversed on reargument.

John R. L. Smith and W. A. Thompson, for trustee.
Evans & Evans and T. S. Felder, for Louis Cohen.

SPEER, District Judge (orally). This case seems to me a perfectly plain one. Duggan carried on business in Sandersville, which was the residence of Mr. Cohen. Mr. Cohen, it seems, was a man of some capital, and, notwithstanding his proximity to Mr. Duggan, the business of the latter did not thrive. He had to move from Sandersville, and he selected for the scene of his later activities the interesting community of Eastman. Before leaving Sandersville, however, he borrowed the money involved in this controversy from Cohen, and gave a mortgage therefor. Mr. Cohen, who is accustomed to the methods of business men, sent his mortgage down to Eastman, and when Mr. Duggan got there, or very soon after he got there, he found that this mortgage had been spread upon the record; Mr. Cohen having directed that course.

It does not appear that the people of Eastman are wholly indifferent to the affairs of each other. They soon made inquiry as to the financial standing of the newcomer, and naturally they went to the record where incumbrances of this character should be recorded. They immediately discovered the existence of this mortgage. Then there was trouble in the camp of the Duggans. Notwithstanding the fact that they had brought down the name of "Sandersville" from their former habitation, and had attached it to the new store in Eastman, it did not propitiate the people of Eastman to the extent of making them ignore the presence of the mortgage, which also came from Sandersville. Duggan returned at once to Sandersville, and had a conference with Cohen, explained the situation, and made a payment of $150 on the mortgage, and Cohen consented to mark it paid, and mark the mortgage canceled. At the same time he took a new mortgage, which he did not in any way impart to the knowledge of the people of Eastman, or other people having business transactions with the Sandersville store of Eastman. He held this mortgage for some eight months. Duggan's troubles apparently did not decrease. He went back to see Cohen, who it seems was his guide, philosopher, and friend, and as well his creditor. He went back to get his advice, and submitted his affairs to Mr. Cohen. The advice to Duggan was: "You are broke, and I am going to put my mortgage on record." It seems that was done the next day. But in the meantime, while the latent and undisclosed mortgage, so to speak, was in the hands of Mr. Cohen and not recorded, Duggan had been accumulating debts in Eastman. He could not buy a thing while the first mortgage was on the record, but, when Mr. Cohen marked that mortgage canceled, the world was open to him, and his financial standing apparently impregnable, he could get all of the goods he wanted, and yet the people who sold him were wholly unaware that Cohen had in his hands a mortgage, not only on the property which Duggan previously had, but upon the new goods which he was adding

to his store. Cohen had nothing at all to lose by the transaction. He was safe if nobody else interfered. The creditors had everything to lose because they were selling to an insolvent, and were furnishing additional security to Cohen. But, unhappily for the kind-hearted Cohen and the perturbed Duggan, the law steps in, bankruptcy immediately ensues, and the property of Duggan is seized. The mortgage was interposed by Cohen, and the referee, who, according to the statement of Mr. Smith, at first seemed to regard the whole transaction as utterly preposterous, to the amazement of the latter gentleman finally held that the mortgage was a good and valid mortgage, and entitled to be paid as such out of the assets of Duggan.

Now, I am constrained by the rulings frequently made by this court, by the Circuit Court of Appeals of this circuit, and by the Supreme Court of the United States to reach the conclusion that there was an actual agreement between Cohen and Duggan to keep that mortgage from the record, and that it was an agreement in fraud of all persons subsequently creating debts, or having transactions which would be prejudiced thereby. If it was a mere careless failure in withholding the record of the mortgage, it would not have amounted to much; the mortgage would have been good against everybody except subsequently acquired liens; but it being an agreement to withhold the mortgage from the record, with the obvious purpose of enabling Duggan to buy when otherwise he could not buy, the obvious purpose of creating a state of credit for him when no credit existed, everybody who was injured by it has the right to claim that it was a fraud. The agreement was a fraud, however well intended, as to their rights, and the trustee representing these subsequent creditors had the right to attack the mortgage, and I hold that the attack must prevail, and that the referee must be reversed.

### On Reargument.

This case has been before the court three times. This is the third hearing.

Without recapitulating the recitals of the first opinion the court will merely quote this passage:

"Now I am constrained by the rulings frequently made by this court, by the Circuit Court of Appeals of this circuit, and by the Supreme Court of the United States to reach the conclusion that there was an actual agreement between Cohen and Duggan to keep that mortgage from the record, and that it was an agreement in fraud of all persons subsequently creating debts, or having transactions which would be prejudiced thereby. If it was a mere careless failure in withholding the record of the mortgage, it would not have amounted to much, the mortgage would have been good against everybody except subsequently acquired liens, but it being an agreement to withhold the mortgage from the record, with the obvious purpose of enabling Duggan to buy when he could not buy, the obvious purpose of creating a state of credit for him when no credit existed, everybody who was injured by it has the right to claim that it was a fraud. The agreement was a fraud, however well intended, as to their rights, and the trustee representing these subsequent creditors had the right to attack the mortgage, and I hold that the attack must prevail, and that the referee must be reversed."

The court, no doubt impressed by the attitude of the parties in the Clayton Case,[1] in that ruling treated the case as if it had been brought

[1] 121 Fed. 630, 57 C. C. A. 656.

solely for the benefit of the subsequent creditors. Thereafter it was discovered in the case now before the court that there was enough money in the hands of the trustee to pay the creditors whose claims were created subsequently to the execution of the mortgage. An application was made by counsel for Mr. Cohen, and the decree was so modified as to allow the subsequent claims to be paid, and then that the mortgage be paid. As I remember the circumstances, there was some dispute about the correctness of that view, and counsel for the trustee notified the court that he was aggrieved by the ruling, and he proposed to except. Counsel for both parties being before the court, it was suggested that a rehearing be had in order that, if any error had been committed, it might be corrected. This was ordered, and this rehearing is the result of that order.

The case as presented now gives to the court an impression of the rights of the parties which it did not have at the time of the first ruling mentioned. The rights of the antecedent creditors were not before the court, at least were not considered, nor was the atteniton of the court called to the fact that creditors antecedent to the mortgage would insist that their claims should be good against the mortgage. The rehearing stresses that contention. Now, when we look to the ruling of the court, we find a distinct holding that the mortgage was a fraud, not only as to subsequent creditors, but as to all concerned. We find that the fraudulent character of this mortgage is distinctly alleged and plainly made out. It is a fraudulent conveyance in contemplation of the Statute of Elizabeth, which is the law of Georgia. 2 Bouvier's Law Dictionary, p. 846, declares:

"Fraudulent conveyances received early attention; and St. 13 Eliz. c. 5, and St. 27 Eliz. c. 4, made perpetual by 29 Eliz. c. 18, declared all conveyances made with intent to defraud creditors, etc., to be void. By a liberal construction, it has become the settled English law that a voluntary conveyance shall be deemed fraudulent against a subsequent purchaser even with notice. These statutes have been generally adopted in the United States as the foundation of all the state statutes upon this subject. 1 Story, Eq. Jur. 353; 4 Kent, 462."

Now, in order to show fraud, it is necessary to show that the conveyance was made to "hinder and defraud creditors." This is a term used relatively to the law of fraudulent conveyances, "made to hinder and defraud creditors." It is defined as "facts tending to throw suspicion on the transaction calling for an explanation." Then follows a catalogue of badges of fraud. One cited by the learned author with authority to support it is "failure to record a mortgage by agreement."

That fact appeared in this case. Well, what is the result? Under the law of Georgia "fraud voids all contracts." That is a part of the public policy of the state. Any party or privy may attack a transaction for "fraud in its procurement." It may be, I think, conclusively stated that a creditor of a bankrupt estate is "privy" to attack any fraud which may preclude his rights, by the creation of a privileged debt as against those rights.

The consequence and importance of this element of fraud as against public policy is made manifest by the Civil Code of Georgia of 1895, Section 3694 provides:

"The bona fide holder for value of a bill, draft, or promissory note, or other negotiable instrument, who receives the same before it is due, and without notice of any defect or defense, shall be protected from any defenses set up by the maker, acceptor or endorser, except the following: 1. Non est factum. 2. Gambling, or immoral and illegal consideration. 3. Fraud in its procurement."

Thus fraud will constitute a defense to a note or other negotiable instrument even in the hands of a bona fide holder.

Now, that being true, why have not these antecedent creditors, who are privies to this bankrupt estate, the right to attack this privileged debt? It is privileged as against them if it be good, and would take the money in the hands of the trustee. But, if it be not good, creditors of the same rank are put on an equal footing. Eliminating the privileged feature of this security, all creditors stand upon an equal footing. This mortgage, therefore, with a secret agreement to be withheld from the record, after deliberate notification to the mortgagee, is a void transaction. The court, therefore, upon rehearing must declare the mortgage void not only as to subsequent creditors, but as to all who are interested in the estate, and will enter a decree accordingly.